# EXHIBIT A

Vess A. Miller, State Bar No. 278020
Natalie A. Lyons, State Bar No. 293026
**COHENMALAD, LLP**
One Indiana Square, Suite 1400
Indianapolis, IN 46204
vmiller@cohenmalad.com
nlyons@cohenmalad.com

Carly M. Roman, State Bar No. 349895
**STRAUSS BORRELLI, PLLC**
980 N. Michigan Avenue, Suite 1610
Chicago, IL 60611
croman@straussborrelli.com

[Additional counsel listed on signature page]
*Attorneys for Plaintiffs*

ELECTRONICALLY FILED
Superior Court of California,
County of San Diego
12/24/2025 8:32:01 AM
Clerk of the Superior Court
By B. Ramirez, Deputy Clerk

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN DIEGO

UNLIMITED JURISDICTION

| | |
|---|---|
| JOE ESCARENO and JUSTIN MANSOUR, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>RPM LIVING, LLC, a limited liability company,<br><br>Defendant. | Case No. 25CL068458C<br><br>**CLASS ACTION**<br><br>**CLASS ACTION COMPLAINT FOR**<br><br>**1. Violation of the False Advertising Law, Cal. Bus. & Prof. Code §§ 17500–17606;**<br>**2. Violation of the Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200–17210; and**<br>**3. Unjust Enrichment**<br><br>**JURY TRIAL DEMANDED** |

CLASS ACTION COMPLAINT

Plaintiffs Joe Escareno and Justin Mansour, on behalf of themselves and all others similarly situated, complain of Defendant RPM Living, LLC, ("RPM") as follows, on information and belief except as to their own experiences and matters of public record:

**INTRODUCTION**

1. "When shopping for a good or service, consumers want to know: how much?"[1]

2. "Unfortunately, consumers face widespread and growing unfair and deceptive fee practices that make it much harder to find out" the answer to this basic question.[2]

3. One such unfair and deceptive practice is called "drip pricing."

4. "Drip pricing" is the practice of listing one price for a good or service up front, then adding one or more hidden "junk fees" to the total price just before the consumer decides to complete the transaction.

5. California law prohibits drip pricing as a form of dishonest bait and switch advertising.

6. RPM manages numerous residential apartment properties across the country, including five in and around San Diego. RPM does just what the law prohibits. The rent it advertises up front for a unit at one of the properties in its portfolio is not a price any renter can pay. The up-front price exists only to entice consumers into making a rental decision anchored in the up-front price, discounting or ignoring the hidden, mandatory junk fees RPM smuggles in later. These fees are not disclosed until deep in the application process or, worse, until a prospective renter has a copy of the lease agreement in his hands.

7. Plaintiffs have rented apartments at Radian, a San Diego property managed by RPM, the price of which was misleadingly and unlawfully advertised as lower than the total price they would pay.

8. On their own behalf and on behalf of all other similarly injured consumers in California, Plaintiffs bring this action to put a stop to RPM's illegal business practices and to remedy the injuries they have caused, seeking relief for RPM's (I) violation of the False Advertising Law

---

[1] Trade Regulation Rule on Unfair or Deceptive Fees, 90 Fed. Reg. 2,066, 2,067 (Jan. 10, 2025).
[2] *Id.*

(FAL), Cal. Bus. & Prof. Code §§ 17500–17606; (II) violation of the Unfair Competition Law (UCL), Cal. Bus. & Prof. Code §§ 17200–17210; and (III) unjust enrichment.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction of this action under the California Constitution, article VI, § 10, and Code of Civil Procedure § 410.10.

10. The total amount of damages incurred by Plaintiffs and the Class in the aggregate exceeds the jurisdictional minimum of this Court.

11. Venue is proper in this Court under California Business & Professions Code § 17203 and Code of Civil Procedure §§ 395(a) and 395.5 because Plaintiffs' injuries occurred in the County of San Diego.

## PARTIES

12. Plaintiff Joe Escareno is a resident of San Deigo, California.

13. Plaintiff Justin Mansour is a resident of San Diego, California.

14. Defendant RPM Living, LLC, is a limited liability company formed under the laws of Texas with its principal place of business at 5508 Parkcrest Drive, Suite 320, Austin TX 78731.

## FACTUAL ALLEGATIONS

I.  **Drip pricing harms consumers.**

15. "Hidden fees" refer to fees charged by sellers in consumer transactions that are obscured from the consumer.[3] Hidden fees are a kind of "junk fees."[4] Such fees are "mandatory but not transparently disclosed to consumers."[5] Consumers may be "lured in with the promise of a low

---

[3] *See* Fed. Trade Comm'n, *Bringing Dark Patterns to Light* 7 (Sept. 2022), https://www.ftc.gov/system/files/ftc_gov/pdf/P214800%20Dark%20Patterns%20Report%209.14.2022%20-%20FINAL.pdf/.
[4] Fed. Trade Comm'n, *FTC Proposes Rule to Ban Junk Fees* (Oct. 11, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/10/ftc-proposes-rule-ban-junk-fees/ (discussing "hidden fees" as a "junk fee practice[]").
[5] The White House, *The Price Isn't Right: How Junk Fees Cost Consumers and Undermine Competition*, The White House (March 5, 2024), https://web.archive.org/web/20250118015252/https://www.whitehouse.gov/cea/written-materials/2024/03/05/the-price-isnt-right-how-junk-fees-cost-consumers-and-undermine-competition/.

CLASS ACTION COMPLAINT
-2-

price, but when they get to the register, they discover that price was never really available."[6] Hidden junk fees are thus "an evolution of bait-and-switch schemes."[7]

16. The practice of disclosing hidden or junk fees "late in the buying process" is often called "drip pricing."[8] Using drip pricing, "firms advertise only part of a product's total price to lure in consumers."[9] Then, once "the consumer already has spent significant time selecting and finalizing a product or service plan to purchase," the mandatory junk fees are disclosed.[10]

17. As an example of drip pricing of junk fees, the FTC has pointed to "'convenience fee[s]' that appear[] only when a shopper reaches the check-out screen":[11]



18. Consumers "feel committed to a purchase" at this stage of the transaction and thus go through with it anyway, despite feeling "frustrated" that "they have no idea how much it costs until it's too late."[12] "Even when consumers who have experienced drip pricing are aware of the total price and are given the option to change their selection, many do not, despite being dissatisfied."[13]

---

[6] *Id.*
[7] *Id.* n.2.
[8] *Bringing Dark Patterns to Light*, *supra* note 3, at 8–9.
[9] *Id.* at 8.
[10] *Id.* at 9.
[11] *Id.* at 23, 30.
[12] *Id.* at 9.
[13] U.K. Competition & Mkts. Auth., *Online Choice Architecture—How Digital Design Can Harm Competition and Consumers* 29 (Apr. 2022), https://assets.publishing.service.gov.uk/media/624c27c68fa8f527710aaf58/Online_choice_architecture_discussion_paper.pdf/.

CLASS ACTION COMPLAINT
-3-

19. "[S]everal psychological mechanisms" are responsible for drip pricing's effectiveness at influencing consumer behavior. Once a consumer has committed to a purchase, "abandoning it" in the face of drip-priced junk fees "may cause feelings of uncertainty, dissatisfaction and cognitive dissonance." Drip pricing practitioners may "rely on the extra effort that would be required" for consumers to back out of the transaction at its last step, "such that consumers accept the price increasing later in the purchase process."[14]

20. In turn, "[s]everal behavioural biases" drive these mechanisms, including "anchoring," or the tendency to "anchor on initial price information" without "fully adjust[ing]" one's "view of the price" once all mandatory fees are disclosed; the "sunk cost fallacy," or the tendency to "continue with a process if [consumers] have invested time or effort"; and the "endowment effect," or the tendency to "place a higher value on objects [consumers] own, or have imagined owning."[15]

21. Drip pricing harms consumers.

22. "Junk fees cost American families tens of billions of dollars each year and inhibit competition, hurting consumers, workers, small businesses, and entrepreneurs."[16]

23. "Drip pricing has been shown in several experimental, theoretical and real-world contexts to lead consumers to buy more, overspend, underestimate the total price, make mistakes when searching, and be less happy with their purchases."[17]

24. As one individual commenter put it to the FTC, drip pricing is "endless, ubiquitous and makes it extremely difficult for consumers to make informed decisions."[18]

25. As another individual commenter put it to the FTC, "It's one thing to be on guard when walking down a dark alley, but being on guard every time you want to take a vacation, go to a concert,

---

[14] *Id.* at 30.
[15] *Id.*
[16] The White House, *Biden-Harris Administration Announces Broad New Actions to Protect Consumers From Billions in Junk Fees* (Oct. 11, 2023), https://web.archive.org/web/20250118020934/https://www.whitehouse.gov/briefing-room/statements-releases/2023/10/11/biden-harris-administration-announces-broad-new-actions-to-protect-consumers-from-billions-in-junk-fees/.
[17] *Online Choice Architecture*, *supra* note 13, at 30.
[18] Trade Regulation Rule on Unfair or Deceptive Fees, 90 Fed. Reg. 2,066, 2,067 (Jan. 10, 2025).

fly home to see a sick loved one—that's just not fair."[19]

26. "Drip pricing interferes with consumers' ability to price-compare and manipulates them into paying fees that are either hidden entirely or not presented until late in the transaction."[20]

27. According to one study, consumers who were not shown full prices, including mandatory fees, at the beginning of a transaction "ended up spending about 20% more money and were 14% more likely to complete [it]" than consumers to whom junk fees were disclosed up front.[21]

28. Another study found that consumers "based their purchase decision exclusively on the base price," that is, the price before hidden fees were added.[22]

29. Drip pricing thus causes consumers to "spend more than they intend, choose unsuitable products and waste their time."[23]

30. Drip pricing harms honest businesses, too.

31. An "honest business that sets forth the total price of its product at the outset will be at a significant disadvantage when compared to a seller that advertises an artificially low price to draw consumers in, then adds mandatory charges late in the transaction."[24]

32. Drip pricing thereby harms free and fair competition.

33. "Since consumers are more likely to choose products based on characteristics they find most salient, businesses will tend to compete harder on those characteristics and less hard on less salient characteristics." Mandatory fees disclosed only at the final stages of a transaction are definitionally "less salient" than up-front prices and, therefore, generate "little to no competition."[25]

34. One experimental study found that sellers "set the highest possible drip price, and compete only on base prices."[26]

---

[19] *Id.*
[20] *Bringing Dark Patterns to Light*, supra note 3, at 9.
[21] *Id.*
[22] Alexander Rasch, Miriam Thöne, Tobias Wenzel, *Drip Pricing and Its Regulation: Experimental Evidence*, 176 J. Econ. Behavior & Org. 353 (2020), https://www.sciencedirect.com/science/article/abs/pii/S0167268120301189/, *pre-print available at* https://www.econstor.eu/bitstream/10419/181760/1/1029741549.pdf/.
[23] *Online Choice Architecture*, supra note 13, at 30.
[24] *Bringing Dark Patterns to Light*, supra note 3, at 9.
[25] *Online Choice Architecture*, supra note 13, at 30.
[26] *Drip Pricing and Its Regulation*, supra note 22.

CLASS ACTION COMPLAINT
-5-

35. For this reason, drip pricing is difficult or impossible to correct using only market pressures.[27]

36. The law must intervene.[28]

**II. California and federal law protect consumers against drip pricing.**

37. "[T]he price a Californian sees should be the price they pay."[29] This straightforward, commonsense proposition underlies California Senate Bill 478, effective July 1, 2024, codified at Cal. Civ. Code § 1770(a)(29), called the "Honest Pricing Law" or "Hidden Fees Statute."

38. In enacting the Honest Pricing Law, the Legislature made clear that bait-and-switch drip pricing was *already* prohibited under existing California law.

39. As the Legislature explained, "like other forms of bait and switch advertising," drip pricing is "prohibited by existing statutes, including the Unfair Competition Law … and the False Advertising Law."[30]

40. Federal law likewise prohibits dishonest bait-and-switch advertising like drip pricing. Section 5(a) of the FTC Act prohibits "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce."[31]

41. The FTC has brought enforcement actions against drip pricing practices for violating Section 5(a). For example, in *Federal Trade Commission v. Liberty Chevrolet, Inc.*, the agency alleged among other things that a car dealership advertised "vehicles for sale at a specific price but then fail[ed] to honor those prices."[32] The dealership falsely represented that consumers could purchase cars for advertised prices that "failed to include an additional certification fee."[33] Consumers

---

[27] *See id.* at 31 ("Where there are enough consumers who do not detect and avoid drip pricing, competitive pressures may also not be sufficient to incentivise businesses to educate or provide more upfront price information to consumers.").
[28] *See id.* (discussing regulatory interventions).
[29] Cal. Dep't of Justice Off. of the Att'y Gen., *SB 478 Frequently Asked Questions* 1 (emphasis omitted), https://oag.ca.gov/system/files/attachments/press-docs/SB%20478%20FAQ%20%28B%29.pdf/.
[30] S.B. 478, 2023–2024 Leg. § 1(b) (Cal. 2023).
[31] 15 U.S.C. § 45(a).
[32] Compl. ¶ 10, *Fed. Trade Comm'n v. Liberty Chevrolet, Inc.*, No. 1:20-cv-03945-PAE (S.D.N.Y.), ECF No. 7.
[33] *Id.* ¶ 11.

would invariably find that the advertised car could "only be purchased for a higher price" that included the fee.[34] The dealership thereby "charge[d] consumers higher sales prices than advertised"[35] in violation of Section 5(a).[36]

42. The FTC has also warned businesses that drip pricing invites Section 5(a) enforcement. For example, the agency has warned hotel operators that failure to disclose mandatory fees up front "may violate the law by misrepresenting the price consumers can expect to pay for their hotel rooms."[37]

43. In furtherance of its authority "to define with specificity unfair or deceptive acts or practices" under the FTC Act, the FTC has recently promulgated a Rule on Unfair or Deceptive Fees, which prohibiting drip pricing in the live-event ticketing and short-term lodging industries specifically.[38]

### III. RPM dishonestly baits renters using drip pricing.

44. RPM's marketing lures in potential renters using drip pricing.

45. For example, searching RPM's website for the Radian property for an apartment with a particular floorplan (here, "JA") may show a listing for units "[s]tarting at" $2,950:

---

[34] *Id.*
[35] *Id.*
[36] *Id.* ¶¶ 35–37. The case settled for $1,500,000 in consumer refunds and permanent injunctive relief. *See Fed. Trade Comm'n v. Liberty Chevrolet, Inc.*, No. 1:20-cv-03945-PAE (S.D.N.Y.), ECF Nos. 15–16.
[37] Fed. Trade Comm'n, *Model Warning Letter* 1 (Nov. 2012), https://www.ftc.gov/sites/default/files/attachments/press-releases/ftc-warns-hotel-operators-price-quotes-exclude-resort-fees-other-mandatory-surcharges-may-be/121128hoteloperatorsletter.pdf/; *see* Fed. Trade Comm'n, *FTC Warns Hotel Operators that Price Quotes that Exclude 'Resort Fees' and Other Mandatory Surcharges May Be Deceptive* (Nov. 28, 2012), https://www.ftc.gov/news-events/news/press-releases/2012/11/ftc-warns-hotel-operators-price-quotes-exclude-resort-fees-other-mandatory-surcharges-may-be/.
[38] Trade Regulation Rule on Unfair or Deceptive Fees, 90 Fed. Reg. 2,066 (Jan. 10, 2025).

CLASS ACTION COMPLAINT
-7-



46. That price is not available to any consumer.

47. Checking for the availability of "JA" floorplan apartments returns a list of currently or soon-to-be available apartments, all "[s]tarting at" a given figure:



48. These prices are not available to any consumer.

49. Clicking "Lease Now" next to the first listing (#1007) takes the user to a lease-term selection page *again* advertising the same "starting at" monthly rent:



CLASS ACTION COMPLAINT
-8-

50. That price is not available to any consumer.

51. Now, drop by drop, RPM begins to disclose the full scope of the fees it proposes to extract from consumers.

52. Having selected a unit and lease term, the user is next taken to a screen that increases the monthly rent for unit #1007 by $70 without explanation:



53. In fine print below the suddenly increased rent RPM has added, "Includes Community Amenity Fee." Only when the user clicks "view details" does RPM explain that it charges a mandatory $70 monthly fee in addition to rent:



54. What "amenities" are covered by the fee is not disclosed.

55. It gets worse. Only once consumers have a lease agreement in hand are the full scope of a renter's monthly charges revealed.

56. There is a mandatory $5 monthly "administrative billing fee," exacted no matter whether utility bills are paid directly to the property owner or through a third-party billing company.

The lease nowhere explains the nature or purpose of the fee.

57. There is a $25 monthly fee for participating in a liability insurance program. The lease requires all tenants to carry "personal liability coverage" of least $100,000. While the lease in theory allows renters to purchase their own insurance, the requirements are onerous, and payment is required either way.

58. There is a mandatory $5 monthly "pest control" fee, otherwise unexplained, which does not even cover treating "[e]mergency infestations, bed bugs, or flea[s]"; those pests "may require an additional fee."

59. California landlords are obligated by statute to keep the "[b]uilding, grounds, and appurtenances … , and all areas under control of the landlord, … in every part clean, sanitary, and free from all accumulations of debris, filth, rubbish, garbage, rodents, and vermin." Cal. Civ. Code § 1941.1(a)(6).

60. Since approximately June 10, 2025, RPM has published a "Community Fee Guide" "[f]or transparency," located at the bottom of the floorplan-selection page of RPM's website for Radian, which confusingly purports to list "what your rent includes and what may constitute additional fees." But this guide is not referenced during the application process and does nothing to cure the deceptions created by RPM's advertised "starting at" rents—rents at which no Radian unit is available.

61. In short, after renters have likely invested significant time and energy selecting the apartment of their choice, it is only upon selecting a specific unit and a specific term that the existence of a mandatory $70 monthly "community amenities fee" is disclosed. Further, it is only after receiving a proposed lease agreement that renters are made aware of additional mandatory monthly fees, for which property owners are in part themselves legally responsible.

62. All told, RPM's deceptive drip pricing practices add approximately $105 in undisclosed mandatory monthly fees to renters' monthly bills.

IV. **Plaintiffs are victims of RPM's deceptive drip pricing practices.**

63. Plaintiffs have been victims of RPM's deceptive drip pricing practices.

64. Plaintiffs have both rented units at Radian.

65. Plaintiffs were baited into these transactions by, and relied on, the rents RPM advertised up front on its website.

66. Those rents were never available to them.

67. Plaintiffs were required to pay mandatory but unannounced monthly fees in addition to their monthly rents, including the amenities, utility billing, pest control, and liability insurance fees.

68. Plaintiffs believed the initially listed rents would be the actual rents they would pay.

69. In other words, Plaintiffs believed the up-front price included all mandatory fees.

70. Plaintiffs relied on the up-front price in comparing units at Radian to other available rental properties, and in their initial rental decisions.

71. The mandatory fees over and above Plaintiffs' monthly rents were not disclosed to them until RPM allowed them to view its proposed lease for Radian, by which time Plaintiffs were already well into the rental process; had already decided to rent at Radian; and, as RPM knew, were highly unlikely to back out of the transaction.

## CLASS ALLEGATIONS

72. Plaintiffs bring this action under section 382 of the California Code of Civil Procedure, on his own behalf and on behalf of all others similarly situated.

73. Subject to future amendment or revision, Plaintiffs seek to represent the following putative class ("Class"):

> All California residents who rented an apartment managed by RPM through RPM's website or after viewing listings on RPM's website at any time between the date four years before this complaint is filed and the date a class certification order is entered in this action.

74. Excluded from the Class are Defendant's officers, directors, and employees; Defendant's parents, subsidiaries, affiliates, and any entity in which Defendant has a controlling interest; undersigned counsel for Plaintiffs; and all judges and court staff to whom this action may be

assigned, as well as their immediate family members.

75. While Plaintiffs do not know the exact size of the Class, due to the nature of the trade and commerce involved, Plaintiffs reasonably believe that Class Members are so numerous that joinder of all members is impracticable, as Plaintiffs estimate it numbers in the thousands.

76. Questions of law and fact common to the Class exist, including without limitation:

    (a) whether Defendant has charged hidden junk fees to Plaintiffs and Class Members through drip pricing practices;

    (b) whether Defendant's conduct violates the FAL and UCL;

    (c) whether Defendant's conduct was unfair or misleading;

    (d) whether Defendant has been unjustly enriched by Plaintiffs' and Class Members' payments of hidden junk fees;

    (e) whether Plaintiffs are entitled to restitution of the deceptively extracted junk fees; and

    (f) whether Defendant should be enjoined from charging hidden junk fees through drip pricing.

77. Plaintiffs' claims are typical of the Class's. Plaintiffs and Class members share the same legal rights, which Defendant has injured in the same way by charging illegal junk fees through drip pricing.

78. Plaintiffs will fairly and adequately protect the Class's interests, as Plaintiffs share the Class's interest in avoiding illegal drip pricing; have no interest adverse to the Class's; have retained competent counsel experienced in consumer protection and class action litigation; and intend to prosecute this action vigorously.

79. By charging hidden junk fees through drip pricing on each transaction, Defendant has acted on grounds that apply generally to Plaintiffs and the Class.

80. The questions of law and fact common to Plaintiffs and the Class predominate over any individualized questions because, among other reasons, Defendant has violated their rights under the same laws by the same conduct.

81. A class action is superior to other available methods for adjudicating this controversy

because it will permit a large number of Class members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense required by hundreds, or thousands, of individual actions. Class action treatment will permit adjudication of relatively modest claims by Class members, who could not individually afford to litigate their claims against Defendant.

82. Defendant has acted or refused to act on grounds generally applicable to the Class, making final injunctive relief appropriate with respect to the Class as a whole. Defendant's practices challenged herein apply to and affect Class members uniformly.

## FIRST CAUSE OF ACTION

**Violation of the False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, 17530**

83. Plaintiffs reallege paragraphs 1–71 above.

84. Section 17500 of the Business and Professions Code provides that it is unlawful to make, disseminate, or cause the dissemination of advertising "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

85. Section 17500 of the Business and Professions Code provides further that it is unlawful to make, disseminate, or cause the dissemination of false or misleading advertising "as part of a plan or scheme with the intent not to sell … at the price stated therein, or as so advertised."

86. Section 17530 of the Business and Professions Code provides that it is unlawful for any person to make or disseminate "any statement or assertion of fact … concerning … [a] characteristic, quality, or attribute of any real estate located in this state or elsewhere, which is known to be untrue and which is made or disseminated with the intention of misleading."

87. Defendant violated these provisions of the Business and Professions Code by making or causing the dissemination of false or misleading statements about the monthly cost of renting its apartments, specifically, by advertising one upfront price that is not available to any prospective renter, as part of a carefully engineered drip-pricing advertising scheme intended to bait consumers.

88. Members of the public are likely to be deceived by Defendant's statements that monthly rent for its apartments will be charged at the listed rates; that leases for its apartments are

CLASS ACTION COMPLAINT
-13-

available at the listed monthly rents; and that the only "monthly charges" exacted by Defendant will be the charges listed.

89. As a result of Defendant's violation of the False Advertising Law, Plaintiffs have suffered injury in fact and lost money by spending time and money they would not have spent but for Defendant's misleading drip pricing.

90. For Defendant's violation of the False Advertising Law, Plaintiffs seek an injunction against Defendant's illegal drip pricing, as well as restitution.

## SECOND CAUSE OF ACTION

### Violation of the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200

91. Plaintiffs reallege paragraphs 1–71 above.

92. Section 17200 of the California Business and Professions Code prohibits unfair competition by means of "any unlawful, unfair or fraudulent business act or practice," including by violations of the False Advertising Law.

93. Defendant violated this provision of the Business and Professions Code by (a) unlawfully engaging in drip pricing, in violation of the False Advertising Law and Section 5(a) of the FTC Act; (b) unfairly engaging in unethical bait and switch advertising that injures consumers and benefits no one but Defendant, and violates the legislatively declared policy of price transparency; and (c) fraudulently advertising an upfront price that was lower than the total price—including hidden junk fees—it would ultimately charge.

94. As a result of Defendant's violation of the Unfair Competition Law, Plaintiffs have suffered injury in fact and lost money by spending time and money they would not have spent but for Defendant's misleading drip pricing.

95. For Defendant's violation of the Unfair Competition Law, Plaintiffs seek an injunction against Defendant's illegal drip pricing, as well as restitution.

## THIRD CAUSE OF ACTION

### Unjust Enrichment, California Common Law

96. Plaintiffs reallege paragraphs 1–71 above.

97. Defendant received a benefit at Plaintiffs' expense when Plaintiffs paid the monthly

junk fees Defendant charged.

98. Defendant has unjustly retained the benefit Plaintiffs conferred on it because Defendant procured the benefit through unlawful and misleading drip pricing, as well as through the oppressive psychological mechanisms on which drip pricing depends.

99. For Defendant's unjust enrichment, Plaintiffs seek restitution of the benefits they paid and Defendant unjustly retained.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request relief for themselves and all members of the Class, as follows:

A. for an Order certifying this action as a Class action and appointing Plaintiffs as Class representatives and Plaintiffs' counsel as Class counsel;

B. for equitable relief declaring that Defendant has committed the violations of law alleged herein;

C. for equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein;

D. for equitable relief requiring restitution and disgorgement of the monies wrongfully retained as a result of Defendant's wrongful conduct;

E. for an award of attorneys' fees and costs, as allowed by law;

F. for pre- and post-judgment interest on any amounts awarded; and

G. such other and further relief as this court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

| | | |
|---|---|---|
| 1 | DATE: December 24, 2025 | Respectfully submitted, |
| 2 | | /s/ *Vess A. Miller* |
| 3 | | Vess A. Miller, State Bar No. 278020<br>Natalie A. Lyons, State Bar No. 293026 |
| 4 | | **COHENMALAD, LLP**<br>One Indiana Square, Suite 1400 |
| 5 | | Indianapolis, IN 46204<br>vmiller@cohenmalad.com<br>nlyons@cohenmalad.com |
| 6 | | |
| 7 | | Carly M. Roman, State Bar No. 349895<br>**STRAUSS BORRELLI, PLLC** |
| 8 | | 980 N. Michigan Avenue, Suite 1610<br>Chicago, IL 60611 |
| 9 | | croman@straussborrelli.com |
| 10 | | Gerard J. Stranch, IV*<br>**STRANCH, JENNINGS & GARVEY, PLLC** |
| 11 | | 223 Rosa L. Parks Avenue, Suite 200 |
| 12 | | Nashville, TN 37203<br>gstranch@stranchlaw.com |
| 13 | | |
| 14 | | *Attorneys for Plaintiffs*<br>* *Pro hac vice* application forthcoming |

CLASS ACTION COMPLAINT

-16-